UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CATHERINE R. KARAZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     No. 4:07-CV-1949 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On July 28, 2003, plaintiff Catherine Karaz filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of June 21, 2003. (Tr. 126-28). After plaintiff's application was denied on initial consideration (Tr. 47-50), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 7).

The hearing was held on August 2, 2005. Plaintiff was represented by counsel. (Tr. 541-63). The ALJ issued a decision on December 27, 2005, denying plaintiff's claims, based upon conclusions that plaintiff was engaged in substantial gainful activity or, in the alternative, was capable of returning to her past relevant work. (Tr. 9-19). The Appeals Council denied plaintiff's request for review on October 11, 2007. (Tr. 3-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

The ALJ received testimony from the plaintiff, who was 47 years old at the time of the hearing. (Tr. 544). She had completed the eleventh grade. (Tr. 546). She shares her home with a person who assists with house cleaning and grocery shopping. (Tr. 558). At the time of the hearing, plaintiff's ex-husband paid the premium on her medical insurance coverage through the COBRA program. (Tr. 546).

Plaintiff testified that she was hit by a truck while she was riding her motorcycle. (Tr. 546). She suffered a traumatic amputation of her right leg below the knee, and sustained compound fractures to her pelvis and both arms. (Tr. 547). She complained at the hearing that her prosthetic leg was uncomfortable, because of the heat and her failure to see the prosthetist for necessary adjustments; she stated that she had neglected the adjustments because she could not afford to drive to Columbia, Missouri. (Tr. 547-48). When she is at home she removes the prosthesis and uses a wheelchair. (Tr. 553). She suffers phantom pain in the amputated foot. (Tr. 548). She uses a cane when she walks for stability and comfort. (Tr. 549).

Plaintiff has residual pain in her pelvis. (Tr. 549). The hardware used to stabilize her pelvis after the accident was subsequently removed because it caused her difficulty. Id. Shortly before the hearing, her doctor gave her a brace to wear on her left foot while she sleeps in order to address pain caused by the excessive pressure she places on the ball of that foot. (Tr. 557). She can sit for about 15 minutes at a time without needing to move around and takes pain medication if she has to sit for long periods. (Tr. 549). Plaintiff's left hand had been damaged a year before the accident by staphylococcal infection. (Tr. 554). Plaintiff has plates in her upper and lower right arm and in her upper left arm. (Tr. 551). Although her ability to use her arms and hands has improved, she reported that she has difficulty turning her palms upward and holding objects, such as coins or a cup. She had been told that this was the result

of muscle damage.  (Tr. 551).  She experiences numbness of the thumb and index finger in both hands due to nerve damage.  (Tr. 552).  Writing causes her hand to cramp.  Psychiatric treatment has been recommended but she has not followed the suggestion.  (Tr. 556).

Plaintiff last worked as an accountant in the tire and wheel business she owned with her husband.  (Tr. 553).  She stopped working in the business when she and her husband separated.  She previously owned and operated a dog grooming business. (Tr. 556).  Plaintiff owns 17 rental properties that she and her ex-husband had acquired during the course of their 27-year marriage.  (Tr. 561).  The properties were awarded to her in the divorce proceedings.  (Tr. 555).  She testified that does she not take care of maintenance herself and uses barter to get repairs addressed.  Id.

Plaintiff testified that she takes Vicodin, Ultracet, and Neurontin for pain, (Tr. 550), and Trazodone for sleep.  (Tr. 556).  She tries to limit her use of the Neurontin because "it makes [her] really dopey."  (Tr. 550).  Despite the medications, she has difficulty sleeping due to pain.  (Tr. 556-57).  She naps every day for fifteen minutes to an hour.

With respect to daily activities, plaintiff testified that she prefers not to drive long distances because she must use her left leg to operate the vehicle; in addition, she stated, she does not "trust" her hands to function well.  (Tr. 546).  She spends her days at home, watching television and reading, although she loses interest quickly. (Tr. 560).  She does not cook, other than to use the microwave.  (Tr. 559).  When asked about chores, she testified that she is able to use the vacuum cleaner if it is "not too heavy."  Using a mop hurts her right arm.  She does not wash dishes because her hands "have a mind of their own" and she breaks dishes.  She uses a motorized cart at the grocery store; her helper carries the groceries to the cart and into the house.

(Tr. 558). She uses a wheelchair at home. (Tr. 553). Plaintiff's balance and the pain in her arm make it difficult to carry a 20-pound bag of dog food; she described carrying 15 pounds as "strenuous." (Tr. 559). She is able to bathe herself using a shower chair. Id. She no longer curls her hair because of difficulties with her hands. (Tr. 559-60). Writing causes her hand to cramp. (Tr. 554). She also testified that her memory is quite poor; she believed that she was going to have testing done to determine the cause. Id.

Plaintiff completed a Disability Report as part of her application. (Tr. 214-21). In Section 2 of the form, plaintiff listed the following disabling conditions: amputated right leg, compound fractures of both arms, multiple pelvic fractures, broken hip. As a result, she needed extensive rehabilitation; she could not walk and was confined to home with nursing care. (Tr. 214).

In section 3 of the Disability Form, plaintiff listed her employment: She worked as the secretary and treasurer for the family business from 1994 through early 2003. Her duties included accounting, inventory, ordering, and manual labor. (Tr. 215-16). She used machines, tools, or equipment in connection with her work; her duties required technical knowledge or skills. (Tr. 216). She frequently carried up to 25 pounds per day; the heaviest weight she lifted was 50 pounds. She supervised up to six people and hired and fired employees. (Tr. 216). Plaintiff worked as a dog groomer for six years from 1993 to 1999. She had previously worked as the secretary and treasurer for a used car lot. (Tr. 215). Finally, in Section 7, plaintiff indicated that she had completed "real estate agent training." (Tr. 220).

A wage report shows that plaintiff's earnings varied widely in the ten years before the accident, from $1,053 in 1993 to $33,457 in 1998. (Tr. 109). Plaintiff also completed a Self-Employment/Corporate Officer Questionnaire. (Tr. 119-123). She

stated that she left the family business on January 1, 2003, "due to personal differences with husband who was part owner." (Tr. 119). She listed her duties for the business as "clerical, sales, management, lifting, cleaning, average 12 hours per day. Manual labor when necessary. Small family business, did a bit of everything as needed." (Tr. 120).

## III. Medical Evidence

Plaintiff sustained her injuries in a motorcycle accident on June 21, 2003. She suffered a lacerated liver, traumatic amputation of her right leg, and fractures of the right radius, the right ulna, the left radius, the right femoral shaft, the left sacrum, and several pelvic bones. (Tr. 362). She may have suffered a brief loss of consciousness. (Tr. 324). She was hospitalized at the University of Missouri University Hospital until July 8, 2003. She underwent immediate surgery to irrigate, debride, and stabilize her orthopaedic injuries. (Tr. 358, 376, 400-01). Further surgical intervention was required on June 23, 2003, (Tr. 393-95, 396-99), and July 3, 2003 (Tr. 358). Plaintiff was discharged from the hospital on July 8, 2003, with prescriptions for Neurontin,[1] Lovenox,[2] Percocet,[3] and Ativan.[4] (Tr. 389).

---

[1]Neurontin is the brand name for Gabapentin, prescribed for the treatment of epilepsy and neuropathy. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a694007.html (last viewed on March 6, 2009).

[2]Lovenox is a brand name for Enoxaparin, an injectable blood thinner. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html (last visited on Mar. 23, 2009).

[3]Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[4]Ativan is a brand name for Lorazepam and is prescribed to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a682053.html (last visited on Aug. 29, 2007).

Lincoln County Medical Center Home Care conducted initial assessments for home-based nursing care and physical therapy with plaintiff on July 9, 2003. (Tr. 277-301, 304-06, 246). During the nursing assessment, plaintiff stated that, before the accident, she "drank a[]lot and daily." (Tr. 279). Alcohol dependence was indicated as a high-risk factor for plaintiff. (Tr. 281). Although plaintiff's overall prognosis was rated as "good to fair," with "partial to full recovery expected," her rehabilitative prognosis was rated as "guarded," with "minimal improvement in functional status" expected, id., although the evaluator found that she had "adequate finances" and "positive/supportive relationships" and was "teachable," "compliant," and "willing." (Tr. 283). With limited exceptions, plaintiff was entirely dependent on assistance for basic self-care. (Tr. 295-97). No physical therapy appointments were established. (Tr. 304).

At the time of the initial assessment, plaintiff indicated that she felt pain all over her body in addition to phantom pain. The pain ranged in intensity between 5 and 10 on a 10-point scale, was present all the time, and prevented her from sleeping. (Tr. 285). The evaluator noted that plaintiff cried and hyperventilated during the visit. Plaintiff stated that she had anxiety attacks (Tr. 292) and was anxious "all of the time" (Tr. 293).

Plaintiff next received home services on July 10, 2003. (Tr. 252-56). On that day, she described her pain as ranging in intensity between 5 and 8 on a 10-point scale. (Tr. 253). On July 14, 2003, plaintiff reported that she was experiencing extreme fatigue and weakness. The nurse noted that the incision on plaintiff's stump was healing poorly. (Tr. 257). Her pain ranged between 3 and 8 on a 10-point scale. (Tr. 258). Plaintiff reported that she had experienced chest pains during an anxiety attack. (Tr. 261). Plaintiff's primary care physician, Brian Smith, M.D., was contacted

and asked to monitor her Ativan prescription.[5]  (Tr. 250).  At her next home visit on July 21, 2003, plaintiff identified her pain as ranging between 1 and 9 on a 10-point scale.  (Tr. 263).  She reported that her anxiety attacks were decreasing.  (Tr. 266).

Plaintiff began physical therapy on July 28, 2003.    During a home visit on August 4, 2003, plaintiff described her pain as ranging between 1 and 9.  She continued to report anxiety and insomnia.  (Tr. 269-71).  On August 11, 2003, however, plaintiff was pain-free and "appear[ed] calm and relaxed."  (Tr. 272).  She told the physical therapist that she was doing her exercises as instructed and thought she was better able to bend her right knee.  She was scheduled to see the prosthetist the following week and did not feel that further home-based physical therapy services were presently necessary.  (Tr. 302).

On July 30, 2003, plaintiff reported to the nurse that she had momentarily forgotten about her amputation and had attempted to stand.  She fell, causing pain to her right knee.  (Tr. 267).  Her pain ranged between 1 and 9 on a 10-point scale.

On August 14, 2003, plaintiff was seen for initial assessment of her prosthetic needs by Joseph E. Burris, M.D., of the University of Missouri Physical Medicine and Rehabilitation Clinic.  (Tr. 354-57).  Plaintiff reported that she had been using her arms to bear weight during transfers to and from the wheelchair and hoped to have the restrictions on weightbearing removed.  She also reported that the phantom pain was reasonably well controlled with Neurontin.  (Tr. 355).  Dr. Burris described plaintiff as "somewhat evasive regarding any previous employment."  Id.  On examination, Dr.

_____

[5]The record contains progress notes dated August 1, 2003, and November 18, 2003, from the St. Charles Clinic Medical Group, where Dr. Smith is located.  The copies provided are of poor quality and are substantially illegible.  (Tr. 329-30).

-7-

Burris noted that plaintiff had full knee extension of her right leg; he did not conduct range-of-motion testing of her hip, arms or left lower leg. The incision was not completely closed. (Tr. 356). Dr. Burris recommended that plaintiff begin the preprosthetic training program as soon as she received clearance from her surgeon. A follow-up visit was scheduled for possible prosthesis prescription, if additional healing occurred as anticipated. Id.

Plaintiff next saw Dr. Burris on September 11, 2003. (Tr. 351-53). In the interval, plaintiff's orthopedist Jeffrey Anglen, M.D., had cleared her for limited weightbearing. Physical examination revealed that plaintiff's incision was healing well. Limited testing indicated no significant difficulties in knees or hips or left ankle. Dr. Burris evaluated plaintiff as having "significant pain control issues" and prescribed Percocet. In addition, Dr. Burris encouraged plaintiff to maintain a consistent dose of Neurontin to reduce the risk of long-term phantom pain. (Tr. 351-52).

On September 17, 2003, David Peaco, Ph.D., at St. Charles West Psychological, completed an initial assessment of plaintiff. His notes indicate that plaintiff suffered from sleep disturbance and impaired concentration. He rated her affect as labile and her mood as depressed, anxious, and irritable. There was no indication of suicidal or homicidal ideation. Dr. Peaco assigned an Axis I diagnostic code of 296.32 (major depressive order, recurrent, moderate), and a Global Assessment of Functioning (GAF) score of 55.[6] (Tr. 311). Plaintiff saw Dr. Peaco on September 25 and 26, 2003. (Tr. 310). There are no further treatment notes after this time.

---

[6]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

The record contains notes of an office visit with Dr. Anglen on September 25, 2003. (Tr. 345-46). Plaintiff was using crutches and complained of some pain in her left wrist, where she had restricted motion. She had good ranges of motion in her right elbow and wrist, though x-rays indicated a continuing gap in the right radius and ulna. Dr. Anglen recommended use of a bone stimulator to address this gap. (Tr. 346).

Plaintiff entered the Howard A. Rusk Rehabilitation Center on October 6, 2003, to undergo prosthetic gait training. (Tr. 313-26). At the time of admission, weightbearing restrictions had been decreased and she was "at 30 pounds on the right leg." (Tr. 321). Plaintiff reported that she was self-employed "with some rental apartments." She reported moderate drinking, and denied any history of depression or anxiety. Plaintiff had some numbness in her left hand. (Tr. 322). The admission plan included full team rehabilitation including physical therapy, occupational therapy, and psychology, with extensive work on gait training. The short-term goal was to improve plaintiff's independence with transfers and mobility; the prognosis was assessed as good. She denied pain at admission. (Tr. 323).

Renee C. Stucky, Ph.D., assessed plaintiff's emotional and cognitive functioning during her rehabilitation admission. (324-26). Plaintiff reported that she "remains self-employed and manages several rental properties that are sufficient to support her financially." (Tr. 324). She indicated that she might return to real estate or open a new storage business. She remained interested in motorcycles and planned to modify her bike so that she could resume riding. (Tr. 324-35). A friend was scheduled to move in with plaintiff to assist her. (Tr. 324). Plaintiff described her divorce as "very messy" and a continuing source of significant emotional distress. (Tr. 324). She reported that when she and her husband first discussed separating she made three

suicide attempts, in the pursuit of which plaintiff was "planful and intentional . . . with minimal attempts to seek assistance." (Tr. 325, 326). Plaintiff drank extensively during that time. She also reported that she "receiv[ed] a DWI in 1999." Twenty years earlier she had abused unspecified illicit drugs. Dr. Stucky described plaintiff as engaged during the interview, although her affect was incongruent with the topic. She denied any feelings of hopelessness or suicidal ideation at the present time, and was hopeful of "a new beginning." (Tr. 325). In discussing plaintiff's cognitive status, Dr. Stucky noted that plaintiff reported very mild changes in her memory and attention, attributable to "a high level of emotional issues that she was dealing with." Otherwise, plaintiff's performance on various cognitive tasks was unremarkable. Nonetheless, Dr. Stucky was unwilling to rule out subtle neuropsychological deficits. (Tr. 325, 326). Plaintiff's history of suicide attempts raised concerns for her ongoing ability to cope with stress. In addition, plaintiff was minimizing and avoiding her emotional distress and declined a referral for further services. Dr. Stucky assigned a diagnosis of major depressive order, single episode, in remission, and adjustment disorder with anxious mood. (Tr. 326).

Plaintiff was discharged from the Rusk Rehabilitation Center on October 9, 2003, in stable condition, and demonstrating independence in a number of tasks. (Tr. 316).

Plaintiff was seen by Dr. Anglen on December 11, 2003. (Tr. 340-41). Dr. Anglen described plaintiff as "doing reasonably well" with "soreness diffusely, and aches and pains and stiffness." Plaintiff demonstrated a range of motion of 70 to 90 degrees in the upper arms and full ranges of motion at the wrists and elbows.

However, she still had radial and ulnar gaps in the right forearm. She was directed to continue using the bone stimulator.[7]

Dr. Burris also saw plaintiff on December 11, 2003. (Tr. 338-39). Plaintiff denied significant phantom pain, but noted pain from the fractures. She was increasing her use of her prosthesis. She had good knee extension, and good hip flexion, extension, abduction and adduction. Dr. Burris described her gait as "reasonable," but also stated that her prosthesis required adjustment. Dr. Burris recommended that she find a counselor near her home to address possible post-traumatic stress issues.

On March 25, 2004, Dr. Anglen described plaintiff as doing "reasonably well." (Tr. 337). She walked well with a good range of motion. Nonetheless, she complained that the bone stimulator caused mild pain in her right forearm; she also noted pain on the right side of her pelvis caused by the hardware that was installed to stabilize her multiple fractures. She also had pain in her left knee and foot. Dr. Anglen opined that plaintiff's right forearm nonunion would require surgery and, possibly, an implantable stimulator. He indicated that he would remove the hardware in her pelvis at the same time.

Dr. Burris saw plaintiff on June 3, 2004. (Tr. 413-14). Her gait was stable, but her prosthesis required revision. The record contains notes of adjustments made by

---

[7]On December 10, 2003, Jean Anderson of Disability Determinations Services called plaintiff, who reported that she was struggling with the fit of the prosthetic leg and sometimes was unable to get it im place. The bone stimulator had been in place for two months and was causing a lump in her arm. Lifting more than five pounds caused excruciating pain in her arms. She had trouble grabbing things. She stopped physical therapy when her insurance coverage was maxed out. (Tr. 167-68)

prosthetist Tracy D. Ell on May 19, 2004, and June 3, 2004, and June 23, 2004.[8]  (Tr. 526-28).

At a June 22, 2004 office visit with Dr. Anglen, plaintiff reported worsening pain in her forearm and hip.  She had good range of motion.  X-rays confirmed the continued nonunion of the forearm and some displacement of the hardware in her pelvis.  Dr. Anglen again recommended surgery to address these issues.

On August 11, 2004, Tracy Ell noted that additional adjustments were required to increase control to compensate for the lack of hip stability.  (Tr. 529).  On August 26, 2004, Ms. Ell noted that plaintiff was experiencing a rapid change in her limb volume and a new fit was required.  (Tr. 530).  The new prosthesis was delivered and fitted on September 28, 2004.  (Tr. 531).

On September 29, 2004, Dr. Anglen performed surgery to remove hardware from plaintiff's right hip and right forearm and to replate and graft the nonunion in the right ulna.  (Tr. 451-53).  The following day, she was noted to be very anxious and complaining of pain.  (Tr. 448).  She was discharged from the hospital on October 1, 2004.  (Tr. 436).

The record contains notes from the office of Richard Buckles, D.O., documenting monthly office visits starting October 27, 2004.  (Tr. 508-22).  At intake, plaintiff described herself as "self employed."  (Tr. 521).  In March 2005, plaintiff reported increased pain at times and difficulty sleeping.  Dr. Buckles increased her dosage of

_____

[8]The record also contains an "Initial Patient Assessment" completed by Tracy Ell and dated November 18, 2004.  (Tr. 533-35).  It seems likely that this date is incorrect, because plaintiff initially saw Tracy Ell well before November 2004.  At the time of the initial assessment, it was noted that plaintiff had "impaired" ranges of motion and muscle strength in the right leg.

Vicodin to address pain and added a trial of Trazodone.[9] (Tr. 517). In May 2005, Dr. Buckles replaced the Vicodin with Norco.[10] (Tr. 515). In June 2005, Dr. Buckles noted that plaintiff's chronic pain was controlled by medication; despite that observation, however, he prescribed Ultram,[11] an additional pain medication. (Tr. 514).

The record contains Physical Residual Functional Capacity Questionnaires completed by Tracy Ell, on July 19, 2005 (Tr. 502-06), and Dr. Buckles, on July 25, 2005. (Tr. 509-13). Ms. Ell assessed plaintiff's prognosis as "fair," citing an "extremely short residual limb which inhibits the potential for normal ambulation." (Tr. 502). She noted that the distal end of the tibia becomes hypersensitive with loss of limb volume, and that restrictions in the knee, hip, and musculature impede progress. Ms. Ell identified "normal post-amputation mourning" as a psychological factor contributing to plaintiff's physical condition. (Tr. 503). Ms. Ell noted that while plaintiff's prosthesis was functioning well, she "ambulates with several gait deviations that are very taxing on her body. These stem from her limb length to her shattered pelvis. Prognosis on the amputation side is termed fair." (Tr. 506).

Dr. Buckles similarly assessed plaintiff's prognosis as "fair." He listed her symptoms as decreased use of hands, hand pain and numbness, phantom pain of the right leg and hips, and decreased use of the prosthesis. (Tr. 509). He described her

_____

[9]Trazodone is a seratonin modulater prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia, anxiety, and alcohol abuse. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html (last visited on Mar. 23, 2009).

[10]Norco is a combination of hydrocodone and acetominophen. See Phys. Desk. Ref. 3188 (63rd ed. 2009).

[11]Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time. See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

pain as stabbing, constant, and made worse by activity, and ranging in intensity from 5 to 9. Her pain was controlled by medications, to which she had a "fair response." Dr. Buckles answered "No" to the questions: "Is your patient a malingerer?" and "Do emotional factors contribute to the severity of your patient's symptoms and functional limitations?" He did, however, identify depression as a psychological condition affecting plaintiff's physical condition. (Tr. 510). Dr. Buckles opined that plaintiff's pain and other symptoms would frequently be severe enough to interfere with her attention and concentration. He indicated that plaintiff could tolerate moderate work stress, walk one-half of a city block without rest or severe pain, and sit or stand for 15 minutes at one time or for 2 hours in the course of an 8-hour day. (Tr. 510-11). He also opined that plaintiff needs frequent periods of walking around and the ability to shift positions at will, with frequent unscheduled breaks in the course of a work day. She requires a cane when standing or walking. She can rarely lift and carry 20 pounds and occasionally lift and carry 10 pounds. (Tr. 511). She can never crouch or climb ladders or stairs. She has significant limitations with reaching, handling or fingering; she has somewhat greater impairment in her right arm, hand, and fingers than in her left, and is very limited with respect to her ability to grasp, turn or twist objects and manage fine manipulations. (Tr. 512).

## IV. The ALJ's Decision

In the decision issued on December 27, 2005, the ALJ made the following findings:

1.  Plaintiff met the disability insured status requirements on June 21, 2003, the date she stated she became unable to work, and continued to meet them through December 2008.

2.  Plaintiff was engaged in substantial gainful activity at the time of the decision.

3. The plaintiff had a traumatic right leg amputation and the residuals of bilateral arm fractures and pelvic fractures; she did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. She did not have a severe mental health impairment.

4. Plaintiff's allegations of disabling symptoms precluding all substantial gainful activity were not consistent with the evidence and were not credible.

5. Plaintiff had the residual functional capacity to perform work except for work that involves lifting over ten pounds or standing or walking more than two hours in an eight-hour workday. Plaintiff could sit for six hours in an eight-hour workday. She had no other exertional or nonexertional limitations.

6. Plaintiff could perform her past relevant work as a rental property manager.

7. Plaintiff's noncompliance with medical treatment directives detracted from the credibility of her allegations of disabling symptoms.

8. Plaintiff was not under a disability, as defined in the Social Security Act.

(Tr. 18-19).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.** **Analysis**

Plaintiff's allegations of error attack the ALJ's determination that plaintiff was engaged in substantial gainful activity and his determination of plaintiff's Residual Functional Capacity (RFC).

**1.** **Substantial Gainful Activity**

The ALJ determined that plaintiff engages in substantial gainful activity as the self-employed manager of the rental property she owns.

The definition of "substantial gainful activity" is found at 20 C.F.R. § 404.1572 and provides:

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572. Petersen v. Chater, 72 F.3d 675, 676 (8th Cir. 1995).

If a claimant is a self-employed individual, such as plaintiff, the following three-part test is used to determine if the claimant is engaged in substantial gainful activity:

We will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity if you are self-employed. We will not consider your income alone because the amount of income you actually receive may depend on a number of different factors, such as capital investment and profit-sharing agreements. . . We will evaluate your work activity based on the value of your services to the business regardless of whether you receive an immediate income for your services. We determine whether you have engaged in substantial gainful activity by applying three tests. If you have not engaged in substantial gainful activity under test one, then we will consider tests two and three. The tests are as follows:

(i) Test one: You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business. . . .

(ii) Test Two: You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.

(iii) Test Three: You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

20 C.F.R. § 404.1575(a)(2) (emphasis added).

The Social Security Administration issued a ruling that addresses self-employment. Ruling 83-34 states that "[i]f it is clearly established that the self-employed person is not engaging in substantial gainful activity on the basis of [(Test One)], both the second and third [substantial gainful activity] tests concerning comparability and worth of work must be considered." 1983 WL 31256 at *9 (S.S.A. 1983) (emphasis added). The ALJ considered only Test Two.

Test Two requires evidence in the record from which a meaningful comparison can be made between the claimant and unimpaired individuals in plaintiff's community in the same or similar businesses. Petersen v. Chater, 72 F.3d 675, 678 (8th Cir. 1995). To establish comparability of work activity under Test Two, it is necessary to address the following factors: "hours, skills, energy output, efficiency, duties, and responsibilities. The lack of conclusive evidence as to the comparability of the required factors will result in a finding that work performed is not [substantial gainful activity]." S.S.R. 83-34, 1983 WL 31256 at *8 (emphasis added). The record includes no evidence from which a comparison of the relative factors may be made and, thus, the ALJ's finding that plaintiff engaged in substantial gainful activity is erroneous. The deficiency will not require reversal if the ALJ properly determined that plaintiff is able to perform her past relevant work as a rental property manager. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).

## 2. The ALJ's RFC Determination

The ALJ alternatively found that plaintiff was not disabled at Step 4 of the sequential evaluation process. He determined that plaintiff had the severe impairments of a right leg amputation and residuals of bilateral arm fractures and pelvic fractures. The ALJ further found that the evidence did not establish the

existence of any other persistent, significant, and adverse limitation of function. Finally, the ALJ determined that plaintiff has the RFC to perform sedentary work and could return to her work as a rental property manager. Plaintiff argues that the ALJ did not give the proper weight to the opinions of her treating physician, Dr. Buckles, and her prosthetist, Tracy Ell. She also contends that the ALJ did not properly consider her additional exertional and nonexertional impairments. In addition, the ALJ did not engage in fact-finding with respect to the physical and mental demands of plaintiff's past work.

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of RFC is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff complains that the ALJ did not consider the RFC determination of prosthetist Tracy Ell, who observed that plaintiff "ambulates with several gait deviations that are very taxing on her body. These stem from her limb length to her shattered pelvis. Prognosis on the amputation side is termed fair." Ms. Ell declined to rate plaintiff's capacities with respect to standing, walking and sitting, stating that such questions should be addressed to the orthopaedic specialists.

Under the applicable regulations, Ms. Ell may be considered as an "other" medical source who may provide evidence to show the severity of impairments and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1). The ALJ did not address Ms. Ell's RFC report and there is no indication that he considered her opinion at all. Under Social Security Ruling 06-3P, the ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows . . . a subsequent reviewer to follow the adjudicator's reasoning." S.S.R. 06-3P, 2006 WL 2329939 at *6. Plaintiff argues that the ALJ should have considered the impact of gait deviations in determining her ability to perform the full range of sedentary work. Given that Ms. Ell declined to express an opinion regarding plaintiff's specific capacities, the Court agrees with defendant that the ALJ's silence in this regard is harmless. However, Ms. Ell's observation regarding the impact of gait deviations has bearing on plaintiff's complaint of pain and whether she has stamina to perform sedentary work.

Dr. Buckles opined that plaintiff had significant manipulative limitations and would be expected to miss more than four days of work per month due to her impairments. The ALJ discounted Dr. Buckles' opinion as inconsistent with the medical record as a whole and his own medical findings. In particular, the ALJ noted that Dr. Anglen had found that plaintiff had good range of motion in her arms, elbows, and wrists. Similarly, Dr. Burris noted that plaintiff was using her arms to transfer herself without significant pain. These observations were made before plaintiff had surgery to repair the nonunion in her right forearm and to remove problematic hardware from her pelvis. Dr. Buckles' post-surgical assessment of plaintiff's ability to use her arms is uncontradicted by the opinion of any other medical provider and is consistent with plaintiff's testimony that she does not "trust" her hands to function properly. The ALJ

erred by discounting Dr. Buckles' assessment as inconsistent with the prior medical record without considering the impact of this additional surgery on plaintiff's limitations.

The ALJ also discounted Dr. Buckles' opinion as inconsistent with his own treatment notes. The ALJ specifically addressed a notation that Dr. Buckles made at intake indicating normal neurological findings and one stating that plaintiff was "doing well." These notes are so general that the Court cannot say, as defendant does, that they reflect an internal inconsistency warranting dismissal of the detailed observations Dr. Buckles provided in the RFC. In conclusion, the Court finds the ALJ's reasons for discounting Dr. Buckles' RFC determination are unpersuasive.

The ALJ additionally found that plaintiff's complaints of disabling pain were not credible. In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions." The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

The ALJ state that plaintiff had not consistently followed a regimen of strong pain relief medication. According to the record, in October 2004, Dr. Buckles noted that plaintiff suffered side effects from Neurontin, (Tr. 521), which had previously succeeded in controlling plaintiff's phantom pain. On January 10, 2005, plaintiff reported an increase in her phantom pain and Dr. Buckles noted the need to try different medications. (Tr. 519). On March 23, 2005, he increased plaintiff's Vicodin. (Tr. 517). On May 26, 2005, Dr. Buckles increased the dosage of her pain medication, and on June 22, 2005, he prescribed Ultram, an additional narcotic. (Tr. 514). The ALJ did not address this medication history and, thus, his credibility determination regarding plaintiff's treatment for pain is not entitled to deference.

The ALJ also found that plaintiff did not seek regular sustained treatment for her multiple fractures and amputation. The record reflects that in the fifteen months following the accident, plaintiff had regular and frequent visits with Drs. Anglen and Burris, a period of inpatient rehabilitation, and frequent adjustments or replacements of her prosthesis. She used a bone stimulator for nearly a year; when that failed to resolve the ulnar fracture, she had additional surgery. Thereafter, she had monthly visits with her primary care physician, Dr. Buckles. The ALJ's characterization of plaintiff's treatment history is not supported by the record. The ALJ also noted that plaintiff had not followed treatment recommendations. Plaintiff stated that she had not sought necessary adjustments to her prosthesis because she could not afford to drive to Columbia, Missouri; she additionally testified that she avoided driving herself long distances. When a claimant's failure to seek treatment is a factor in assessing credibility, the ALJ should also consider whether financial concerns interfered with treatment. See Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984) (an inability to afford treatment may excuse noncompliance).

-23-

The ALJ determined that plaintiff could return to her past work as a rental property manager. "An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity." Pfitzner v. Apfel, 169 F.3d 566, 568-69 (8th Cir. 1999) (quoting Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991)). "[A] conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his [or her] past work." Id. (internal citations omitted). "The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work." Groeper, 932 F.2d at 1239. The ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work. Pfitzner, 169 F.3d at 569. In this case, the ALJ did not refer to the Dictionary of Occupational Titles nor did he make specific findings with respect to the actual demands of plaintiff's past work. Thus, the Court cannot say that substantial evidence supports the ALJ's decision.

In summary, the Court concludes that the ALJ erred in his determination that plaintiff was engaged in substantial gainful activity, committed errors in his determination of her RFC, and improperly determined that she can return to her past relevant work. If on remand it is determined that plaintiff is not engaged in substantial gainful activity and suffers from significant nonexertional impairments that limit her RFC, the testimony of a Vocational Expert will be required. Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997).

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole. The decision, therefore, will be reversed and remanded under sentence 4 of 42 U.S.C. § 405(g) for further proceedings.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#15] is **granted**.

**IT IS FURTHER ORDERED** that the decision of the Administrative Law Judge is **reversed** and this matter is **remanded** pursuant to sentence 4 of 42 U.S.C. § 405(g).

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2009.